## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DESTINATION MATERNITY<br>CORPORATION, et al.,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 19-12256 (BLS)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: Docket Nos. 34, 77 & 247** |

### FINAL ORDER (I) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (II) MODIFYING AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF

This matter coming before this Court on the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief* (the "Motion")[2] at an interim hearing on October 22, 2019 (the "Interim Hearing") and final hearing on November 22, 2019 (the "Final Hearing"), the Court has reviewed the Motion, the *Declaration of Lisa Gavales, Chair of the Office of the CEO of Destination Maternity Corporation, in Support of Chapter 11 Petitions and First Day Motions*, the *Declaration of Robert J. Duffy, Chief Restructuring Officer of Destination Maternity Corporation, in Support of Certain First Day Motions*, and the *Declaration of Neil Augustine in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief*, (collectively, the "Declarant Declarations"). The Motion requests the entry of a final order (the "Final Order"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Destination Maternity Corporation (5573); DM Urban Renewal, LLC (N/A); and Mothers Work Canada, Inc. (4780). The location of the Debtors' principal place of business is 232 Strawbridge Drive, Moorestown, New Jersey 08057.

[2]    Capitalized terms used shall have the meanings ascribed to them in the Motion or as defined herein.

(a)    authorizing the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, subject to the terms of this Final Order, and granting adequate protection to the ABL Agent, ABL Lenders, Term Agent, and Term Lenders in respect of their rights under the ABL Loan Documents and Term Loan Documents, as applicable, and their interests in the Prepetition Collateral pursuant to sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code") with respect to any diminution in value of such rights and interests on and after the Petition Date;

(b)    vacating and modifying the automatic stay arising under section 362 of the Bankruptcy Code in accordance with the provisions hereof to the extent necessary to implement and effectuate the terms and provisions of this Final Order; and

(c)    granting certain related relief.

The Court having considered the Motion, the Declarant Declarations, the other filings and pleadings in the above-captioned consolidated chapter 11 cases (each individually a "Case" and collectively, the "Cases"), and the evidence submitted or adduced and the arguments of counsel made at the Final Hearing; and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b)(c), and (d), and 9014; and on October 22, 2019 the Court having entered its "*Interim Order (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*" (the "Interim Order") [ECF No. 77]; and a Final Hearing to consider the final relief requested in the Motion having been held and concluded; and all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

2

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING BY THE DEBTORS, INCLUDING THE SUBMISSIONS AND DECLARANT DECLARATIONS AND REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:**

A.      Petition Date.  On October 21, 2019 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" or this "Court").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

B.      Jurisdiction and Venue.  This Court has core jurisdiction over these Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. sections 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.  The statutory bases for the relief set forth in this Final Order are sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and Local Rule 4001-2.

C.      Notice.  Upon the record presented to the Court at the Final Hearing, and under the exigent circumstances set forth therein, requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (i) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the Internal Revenue Service; (iv) Wells Fargo Bank, National Association, in its capacity as ABL Agent (as defined below); (v) Pathlight Capital LLC, in its capacity as Term Agent (as defined below); (vi) the Committee; (vii) the United States Attorney's Office for the District of Delaware; (viii) the United States Securities and Exchange Commission; (x)

---

[3]      The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

the state attorneys general for states in which the Debtors conduct business; (xi) all parties known to the Debtors who hold any liens or security interests in the Debtors' assets who have filed UCC-1 financing statements against the Debtors; and (xii) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"), which notice was appropriate under the circumstances and sufficient for the Motion, and the entry of this Final Order; and no further notice of or hearing on the entry of this Final Order is necessary or required.

D.      Creditors' Committee.  On November 1, 2019, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") in accordance with Bankruptcy Code section 1102.

E.      The Debtors' Stipulations as to Existing Secured Debt.  Subject only to the limitations contained in paragraph 18 of this Final Order, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree (collectively, the "Debtors' Stipulations") as follows:

(i)      Cash Collateral.  Any and all cash of the Debtors, including cash and other amounts on deposit or maintained in any bank account or accounts of the Debtors and any amounts generated by the collection of accounts receivable, the sale of inventory, or other disposition of the Prepetition Collateral existing as of the Petition Date or arising or acquired after the Petition Date, together with all proceeds of any of the foregoing, is cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") of the ABL Agent and the Term Agent.  For the avoidance of doubt, Cash Collateral includes any proceeds from the sale of inventory or any ABL Collateral or Term Collateral (each as defined below and collectively, "Collateral").  Pursuant to section 363(c)(2) of the Bankruptcy Code, Debtors are not able to use Cash Collateral without the ABL Agent's and the Term Agent's consent or this Court's authorization after notice and a hearing.

5906122.5

The ABL Agent and the Term Agent are willing to consent to the Debtors' use of the Cash Collateral, expressly limited to, and conditioned upon, the terms and conditions specified in this Final Order.

       (ii)    <u>ABL Credit Facility</u>.  Pursuant to the Amended and Restated Credit Agreement, dated March 25, 2016, by and among the Debtors, Wells Fargo Bank, National Association, in its capacities as administrative agent, (in such capacity, "<u>ABL Agent</u>"), and the L/C Issuer, Swing Line Lender and other lenders party thereto (collectively, the "<u>ABL Lenders</u>"), as amended by Consent and Amendment No. 1 to Amended and Restated Credit Agreement, dated December 20, 2016, Amendment No. 2 to Amended and Restated Credit Agreement, dated April 7, 2017, Amendment No. 3 to Amended and Restated Credit Agreement, dated February 1, 2018, and that certain Administration & Consent Fee Letter, dated October 21, 2019 authorizing the payment of that certain $750,000 administration and consent fee (as amended from time to time prior to the Petition Date, the "<u>ABL Credit Agreement</u>" and, together with the other Loan Documents, as defined in the ABL Credit Agreement, the "<u>ABL Loan Documents</u>"), the ABL Agent and ABL Lenders provided a revolving credit facility in the maximum principal amount of $50,000,000.00 to the Debtors. As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind were jointly and severally indebted and liable to the ABL Agent and ABL Lenders under the ABL Loan Documents in an aggregate principal amount not less than $27,725,594.75 consisting of Loans (as defined in the ABL Credit Agreement) in the aggregate principal amount of $22,129,000.00 and Letters of Credit (as defined in the ABL Credit Agreement) in the aggregate undrawn face amount of $5,596,942.75, plus all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and all other "Obligations" (as defined in the ABL Credit Agreement) accrued, accruing, or chargeable in respect thereof, in addition thereto, or arising thereafter (collectively, the "<u>ABL Obligations</u>").

(iii)    ABL Security Agreement.  In connection with the ABL Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of November 1, 2012 (as amended from time to time prior to the Petition Date, the "ABL Security Agreement"), by and between the Debtors, as Grantors, and the ABL Agent.  Pursuant to the ABL Security Agreement and other ABL Loan Documents, each Debtor granted senior liens upon and security interests in substantially all of such Debtor's assets (the "ABL Prepetition Collateral") to the ABL Agent for the benefit of itself and the ABL Lenders as security for the Obligations (as defined in the ABL Credit Agreement) (the "ABL Prepetition Liens"), junior only to the Liens of the Term Agent and Term Lenders on the Term Priority Collateral (as such term is defined in the ABL Security Agreement).

(iv)    ABL Obligations.  The ABL Obligations and the ABL Loan Documents constitute the legal, valid, binding, and non-avoidable obligations and agreements of the Debtors, enforceable in accordance with their terms.  The ABL Obligations constitute allowed claims under section 502 of the Bankruptcy Code.  The ABL Obligations, the ABL Prepetition Liens, and all payments made to the ABL Agent or applied to the ABL Obligations owing under the ABL Loan Documents prior to the Petition Date are not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, nature, or description pursuant to the Bankruptcy Code or other applicable law.

(v)    No Claims Against ABL Agent or ABL Lenders.  Subject to Paragraph 18, below, the Debtors hold no valid or enforceable "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind against the ABL Agent, the ABL Lenders, the ABL Obligations and/or the ABL Prepetition Collateral.  Each Debtor, subject to Paragraph 18, below, hereby forever waives and releases any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights against the ABL Agent and the ABL Lenders and each of their respective officers, directors, employees, agents, sub-agents,

attorneys, consultants, advisors, and affiliates and the ABL Priority Collateral, whether arising at law or in equity, under tort (including lender liability) or contract, including recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

(vi)     ABL Prepetition Liens.  The ABL Prepetition Liens granted to the ABL Agent for the benefit of itself and the ABL Lenders in the ABL Priority Collateral pursuant to and in connection with the ABL Loan Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, deposit account control agreements and other security documents executed by any of the Debtors in favor of the ABL Agent, (A) are valid, binding, perfected, enforceable and non-avoidable first-priority liens and security interests in the Debtors' assets, (B) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (C) are subject and/or subordinate only to valid, perfected, and unavoidable senior priority liens and security interests existing as of the Petition Date securing valid, binding and unavoidable debt permitted under the ABL Loan Documents (the "Permitted Liens"), and (D) constitute the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the applicable ABL Loan Documents.

(vii)     Term Loan Credit Facility.  Pursuant to the Term Loan Credit Agreement, dated February 1 2018, by and among the Debtors, Pathlight Capital LLC, in its capacities as administrative agent and lender (in such capacities, "Term Agent"), and the lenders party thereto (the "Term Lenders", and together with the ABL Lenders, the "Lenders") (as amended from time to time prior to the Petition Date, the "Term Loan Credit Agreement") and, each Loan Document (as defined in the Term Loan Credit Agreement, the "Term Loan Documents", and together with the ABL Loan Documents, the "Loan Documents"), the Term Agent and the Term Lenders provided for loan in the

principal amount of $25,000,000.00. As of the Petition Date, the Debtors were indebted and liable to the Term Agent and Term Lenders under the Term Loan Documents in an aggregate principal amount not less than $23,400,000.00, plus all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and all other obligations accrued, accruing or chargeable in respect thereof, in addition thereto, or arising thereafter (collectively, the "Term Loan Obligations", and together with the ABL Obligations, the "Secured Obligations").

(viii)    Term Loan Security Agreement.    In connection with the Term Loan Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of February 1, 2018 (as amended from time to time prior to the Petition Date, the "Term Loan Security Agreement"), by and between Debtors, as Grantors, and the Term Agent.    Pursuant to the Term Loan Security Agreement and other Term Loan Documents, each Debtor granted a security interest in substantially all of such Debtor's assets (the "Term Loan Prepetition Collateral", and together with the ABL Prepetition Collateral, the "Prepetition Collateral") to the Term Agent for the benefit of itself and the Term Lenders as security for the Term Loan Obligations (the "Term Loan Prepetition Liens", and together with the ABL Prepetition Liens, the "Prepetition Liens"), junior only to the Liens of the ABL Agent and ABL Lenders on the ABL Priority Collateral (as such term is defined in the ABL Security Agreement).

(ix)    Intercreditor Agreement.    The ABL Agent and Term Agent are parties to that certain Intercreditor Agreement dated as of February 1, 2018 (as amended from time to time, the "Intercreditor Agreement").    The Intercreditor Agreement is a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and, among other things, (A) confirms the senior priority of the security interests of the ABL Agent in the ABL Priority Collateral (as defined in the Intercreditor Agreement) to the junior priority security interests of the Term Agent in the ABL Priority Collateral, (B) confirms the senior priority of the security interests of the Term Agent in the

8

Term Priority Collateral to the junior priority security interests of the ABL Agent in the Term Priority Collateral (as defined in the Intercreditor Agreement), (C) subject to certain limitations (as provided in the Intercreditor Agreement), provides that the Term Agent shall be deemed to have consented to the use of cash collateral by the Debtors upon notice of the ABL Agent's consent to such use of cash collateral, and (D) provides certain other rights and obligations between the ABL Agent, on the one hand, and the Term Agent, on the other hand, relating to the Prepetition Collateral.

(x)    No Claims Against Term Agent or Term Lenders. Subject to Paragraph 18, below, the Debtors hold no valid or enforceable "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind against the Term Agent, the Term Lenders, and/or the Term Priority Collateral. Each Debtor, subject to Paragraph 18, below, hereby forever waives and releases any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights against the Term Agent, the Term, Lenders, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, consultants, advisors and affiliates and the Term Priority Collateral, whether arising at law or in equity, under tort (including lender liability) or contract, including recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

F.    Necessity for Relief Requested; Immediate and Irreparable Harm. The Debtors requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) on the terms described herein. The Debtors have an immediate need to use the Cash Collateral to, among other things, preserve and maximize the value of the assets of each Debtor's bankruptcy estate (as defined under section 541 of the Bankruptcy Code, the "Estate") in order to maximize the recovery to all creditors of each Debtor's Estate, absent which immediate and irreparable harm will result to the Debtors, their Estates, and their creditors. Absent the Debtors' ability to use Cash Collateral, the Debtors would not

have sufficient available sources of working capital or financing and would be unable to pay their payroll and other operating expenses or maintain their assets to the detriment of their Estates and creditors.    Accordingly, the relief requested in the Motion and the terms set forth herein are (i) critical to the Debtors' ability to maximize the value of the Estates, (ii) in the best interests of the Debtors and their Estates, and (iii) necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors and the Debtors' Estates, creditors, assets, goodwill, reputation, and employees.

G.  Adequate Protection.  Each of the ABL Agent, Term Agent, and Lenders are entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Collateral, including the Cash Collateral, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral.  Each of the ABL Agent, Term Agent, and Lenders reserves the right to seek additional adequate protection beyond the adequate protection provided in this Final Order, and nothing in this Final Order or otherwise shall be deemed or construed to limit, impair or otherwise prejudice any of the ABL Agent's or the Term Agent's rights to seek and/or obtain such other or additional adequate protection or any other relief.

H.  Section 506(c) and 552(b).  In consideration for the ABL Agent's, Term Agent's, and Lenders' agreement to subordinate the ABL Adequate Protection Superpriority Claim, the ABL Replacement Lien, the ABL Prepetition Liens, the Term Loan Adequate Protection Superpriority Claim, the Term Loan Replacement Lien, and the Term Loan Prepetition Liens, as applicable, on the Prepetition Collateral to fund the Budget and the Carve Out, in each case solely to the extent set forth in this Final Order, the ABL Agent, the Term Agent and the Lenders are entitled to, the benefits of a

5906122.5

waiver of the provisions of Section 506(c) of the Bankruptcy Code and any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

I.    Good Cause.  Good cause has been shown for entry of this Final Order, and the entry of this Final Order is in the best interests of the Debtors, the Estates and their creditors.  Among other things, the relief granted herein will minimize disruption of the Debtors' businesses and permit the Debtors to meet payroll and other expenses necessary to maximize the value of the Estates.  The terms of the Debtors' use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Final Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

J.    Good Faith.  The Debtors' use of Cash Collateral in accordance with the terms hereof has been negotiated in good faith and at arms' length among the Debtors, the ABL Agent and the Term Agent, and the consent of the ABL Agent and the Term Agent to the Debtors' use of Cash Collateral in accordance with the terms hereof shall be deemed to have been made in "good faith."

**BASED UPON THE STIPULATED TERMS SET FORTH HEREIN, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.    Motion Granted.  The Motion is GRANTED on a final basis to the extent provided herein. Any objection to the Motion, to the extent not withdrawn, waived or resolved, is hereby overruled. The Interim Order is hereby ratified and affirmed in all respects, except as modified in this Final Order.

2.    Authorization to Use Cash Collateral.  The Debtors are authorized to use Cash Collateral solely in accordance with and to the extent set forth in the Budget and this Final Order during the period commencing on the date of this Final Order through the Termination Date (the "Cash Collateral Period") in an amount not to exceed at any time the aggregate amount of disbursements projected in the "Total Disbursements" line item of the Budget from the Petition Date

5906122.5

through the applicable date of measurement, subject to any applicable Permitted Variance (defined below) (the "Cash Collateral Limit").

3.    Budget.

(a)    Debtors may use Cash Collateral during the Cash Collateral Period up to the Cash Collateral Limit only to pay the amount (subject to the Permitted Variance) and type of expenses set forth in the cash collateral budget attached as **Exhibit 1** hereto (as the same may be updated from time to time with the prior written consent of the ABL Agent and Term Agent, the "Budget") during the periods covered by the Budget in which such expenses are projected to be paid.

(b)    Not later than 3:00 p.m. (Eastern time) on the Wednesday of each week commencing on November 13, 2019, Debtors shall furnish to the ABL Agent and the Term Agent a weekly report (the "Budget Compliance Report") that sets forth, as of the preceding Saturday of such week, for the prior week and on a cumulative basis from the Petition Date through the third (3rd) full week after the Petition Date and then on a rolling three (3) week basis at all times thereafter (each such reporting period, a "Cash Flow Measurement Period"), the actual results for the following line items set forth in the Budget:  (i) "Total Receipts", (ii) "Total Disbursements", (iii) "Total Inventory; Ending Balance", and (iv) "Professional Fees/Escrow"; provided, that commencing on October 30, 2019, Debtors shall furnish to the ABL Agent and the Term Agent a weekly report that sets forth, as of the preceding Saturday of such week, for the prior week (each such reporting period, a "Professional Fee Measurement Period", and referred to herein collectively with each Cash Flow Measurement Period, as a "Measurement Period") the actual results for the line item set forth in the Budget titled "Professional Fees/Escrow".[4]

---

[4]    For purposes of calculating Budget compliance in any applicable Measurement Period, the Budget attached to this Final Order (as may be amended from time to time in accordance with the terms of this Final Order), or any subsequent Budget shall be used by the Debtors.

5906122.5

(c)    The Debtors hereby covenant and agree that (i) the actual amount of "Total Receipts" for any Cash Flow Measurement Period shall not be less than eighty-five percent (85%) of the amount projected in the "Total Receipts" line item of the Budget for such Cash Flow Measurement Period; (ii) the actual amount of "Total Disbursements" for any Cash Flow Measurement Period, shall not be more than one hundred and ten percent (110%) of the amount projected in the "Total Disbursements" line item of the Budget for such Cash Flow Measurement Period; (iii) the actual amount of "Total Inventory; Ending Balance" at any time in any Cash Flow Measurement Period shall not be less than ninety percent (90%) of the amount projected in the "Total Inventory; Ending Balance" line item of the Budget for the last day of such Cash Flow Measurement Period; and (iv) the actual amount of "Professional Fees/Escrow" for any Professional Fee Measurement Period, shall not be more than one hundred and five percent (105%) of the amount projected in the "Professional Fees/Escrow" line item of the Budget for such Professional Fee Measurement Period (clauses (i) through (iv), individually and collectively, the "Permitted Variance").

(d)    The ABL Agent may, in its sole discretion, agree in writing to the use of the Cash Collateral (i) in a manner or amount which does not conform to the Budget (other than Permitted Variances) (each such approved non-conforming use of Cash Collateral, a "Non-Conforming Use") or (ii) for a period following the Termination Date pursuant to paragraph 5 of this Final Order (such period, the "Subsequent Budget Period"). If such written consent is given, the Debtors shall be authorized pursuant to this Final Order to expend Cash Collateral for any such Non-Conforming Use or any such Subsequent Budget Period in accordance with a subsequent Budget (a "Subsequent Budget") without further Court approval, and the ABL Agent, Term Agent, and Lenders shall be entitled to all of the protections specified in this Final Order for any such use of Cash Collateral; provided, that each such permitted Non-Conforming Use shall be deemed a

5906122.5

modification to the Budget for all testing purposes. The Debtors shall provide notice of any Non-Conforming Use, Subsequent Budget Period and Subsequent Budget to the United States Trustee and the Committee.

(e)    During any Stay Relief Notice Period, the Debtors may only use Cash Collateral to pay the following amounts and expenses solely in accordance with the respective Budget line items in the amounts set forth in the Budget for the week in which such Stay Relief Notice Period occurs: (i) the Carve Out; (ii) obligations for unpaid and accrued payroll and payroll taxes; (iii) sales taxes; and (iv) any such other obligations subject to the prior written consent of the ABL Agent and Term Agent.

4.    Carve Out.

(a)    Carve Out. As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the ABL Agent and by the Term Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business

14

day following delivery by the ABL Agent and the Term Agent of the Carve Out Trigger Notice, to

the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts

set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").[5] For purposes of the

foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other

electronic means) by the ABL Agent and the Term Agent to (x) restructuring co-counsel to the

Debtors, Kirkland & Ellis LLP and Landis Rath & Cobb LLP ("Restructuring Co-Counsel to

Debtors"),  (y) the U.S. Trustee; and (z) counsel to the Committee, Cooley LLP ("Committee

Counsel"), which notice may be delivered following the occurrence and during the continuation of a

Termination Event and upon termination of the Debtors' right to use Cash Collateral by the ABL

Lenders the Term Lenders, as applicable, stating that the Post-Carve Out Trigger Notice Cap has

been invoked.

> (b)    Fee Estimates.  Not later than 7:00 p.m. New York time on the Wednesday of

each week starting with the first full calendar week following the Petition Date, each Professional

Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of

fees and expenses incurred during the preceding week by such Professional Person (through Saturday

of such week, the "Calculation Date") (collectively, "Estimated Fees and Expenses"), along with a

good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred

through the applicable Calculation Date and a statement of the amount of such fees and expenses that

have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that

within one business day of the occurrence of the Termination Declaration Date, each Professional

Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith

---

[5]     Notwithstanding anything to the contrary herein, the fee that becomes due and payable pursuant to paragraph 2(e) of the Greenhill engagement letter, dated August 19, 2019 (the "GHL Fee") shall be, and the ABL Agent and Term Agent have agreed shall be, protected by the Carve Out as Allowed Professional Fees.  On or before the Thursday of each week, the Debtors shall fund a $50,000 reserve on account of the GHL Fee into the Pre-Carve Out Trigger Notice Reserve and, upon delivery of delivery of a Carve Out Trigger Notice, the remaining unreserved amount of the GHL Fee, if any, shall be funded into the Post-Carve Out Trigger Notice Reserve.  In no event shall funds in excess of the GHL Fee be reserved on account of the GHL Fee pursuant to this provision.

estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL Agent and Term Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person.

(c)    Carve Out Reserves.

(i)    On or before the Thursday of each week, Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the greater of (x) the aggregate amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to Debtors, ABL Agent, and Term Agent, and (y) the aggregate amount of Allowed Professional Fees contemplated to be incurred in the Budget during such week. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims, and all payments of Allowed Professional fees incurred prior to the Termination Declaration Date shall be paid first from such Pre-Carve Out Trigger Notice Reserve. Upon the foregoing funding, the Agents and Lenders shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve or subordinate their liens and claims on account of any Allowed Professional Fees incurred through the Calculation Date for the most recent Weekly Statement delivered in accordance with Section 4(b) above.

16

(ii)    On the day on which a Carve Out Trigger Notice is given by the ABL Agent and by the Term Agent, to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to and the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund (A) the Pre-Carve Out Trigger Notice Reserve Account in an amount equal to the aggregate amount of all Estimated Fees and Expenses reflected in the Final Reports timely delivered to Debtors, ABL Agent, and Term Agent plus the amounts set forth in (a)(i) and (a)(ii) of this paragraph above, and (B) after funding the Pre-Carve Out Trigger Notice Reserve Account, a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.[6]  Upon the foregoing funding, the Agents and Lenders shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve or Post-Carve Out Trigger Notice Reserve or subordinate their liens and claims on account of any Allowed Professional Fees.

(d)    Application of Carve Out Reserves.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Trigger Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay, subject to the Intercreditor Agreement, (x) first the ABL Agent for the benefit of itself and the ABL Lenders until all ABL Obligations are Paid in Full, and (y) then the Term Agent for the benefit of itself and the Term Lenders, until all Term Loan Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and

---

[6]    The funds reserved on account of the GHL Fee shall be held in a separate segregated account from the rest of the Post-Carve Out Trigger Notice Reserve and the amounts reserved for the GHL Fee shall be used only to pay the GHL Fee and for no other purpose.

priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Trigger Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve Account has not been reduced to zero, to pay, subject to the Intercreditor Agreement, (x) first the ABL Agent for the benefit of itself and the ABL Lenders until all ABL Obligations are Paid in Full, and (y) then the Term Agent for the benefit of itself and the Term Lenders, until all Term Loan Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the Loan Documents or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 4(d), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Trigger Amounts and Post-Carve Out Trigger Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 4(d), prior to making any payments to the ABL Agent, the Term Agent, or any of the Debtors' creditors, as applicable. Notwithstanding anything to the contrary in the Loan Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the ABL Agent and Term Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Post-Carve Out Trigger Notice Reserve has been fully funded unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve Out Reserves in the amount and to the extent provided for in Paragraph 4(c) above. Further, notwithstanding anything to the contrary in this Final Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (ii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the

contrary in this Final Order or in any Loan Document(s), the Carve Out shall be senior to all liens and claims securing the Prepetition Collateral, the Adequate Protection Liens, any claim of the Agents or Lenders under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the Secured Obligations solely to the extent provided herein.

(e)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out; provided that, upon the funding in of the Carve Out Reserves in accordance with Paragraph 4(c) above, the Agent and Lenders shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve Account on account of any Allowed Professional Fees incurred through the Calculation Date for the most recent Weekly Statement delivered in accordance with Section 4(b) above and the liens and claims of Agent and Lenders shall not be subordinated on account of any such fees.

(f)    No Direct Obligation To Pay Allowed Professional Fees. None of the Agents or Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the Agents or Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)    Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(h)     <u>Budget Not a Consent to Allowance of Professional Fees</u>.  Nothing herein, including the inclusion of line items in the Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expenses of the Debtors, of the Committee, or of any other person or shall affect the right of the ABL Agent or the Term Agent to object to the allowance and payment of such fees and expenses. Furthermore, nothing in this Final Order or otherwise shall be construed: (i) to obligate the ABL Agent or the Term Agent in any way to pay compensation to or to reimburse expenses of any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; or (ii) to increase the Carve Out if allowed fees and/or disbursements are higher in fact than the amounts subject to the Carve Out as set forth in this Final Order.

5.     <u>Termination Date</u>.

(a)     Immediately upon written notice by the ABL Agent and the Term Agent to the Debtors' Restructuring Co-Counsel, the U.S. Trustee and the Committee Counsel, the Debtors' authorization, and the ABL Agent's and the Term Agent's consent, for the Debtors to use Cash Collateral pursuant to this Final Order, shall terminate on the earliest to occur of the following (the earliest such date, herein defined as the "<u>Termination Date</u>"):  (i) the Debtors' failure to satisfy any Milestone set forth in paragraph 27; (ii) the entry of an order of this Court terminating the right of any Debtor to use Cash Collateral; (iii) the dismissal of any of the Cases or the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the appointment in any of the Cases of a trustee or an examiner with expanded powers; (v) the entry of any order of the Court that impairs in any way the security interests, liens, priority claims or rights granted to the ABL Agent and the Term Agent under the terms of this Final Order; (vi) this Final Order shall cease, for any reason, to be in full force and effect, or the Debtors shall so assert in writing, or any liens or claims created in favor of the ABL Agent and the Term Agent under this Final Order shall cease to be enforceable and

of the same effect and priority purported to be created hereby, or the Debtors shall so assert in writing; (vii) any of the Debtors challenge or object to the extent, validity, enforceability, priority, perfection and/or non-avoidability of the Secured Obligations or the ABL Agent's and the Term Agent's security interests in and liens upon the Collateral; (viii) an order of this Court shall be entered reversing, staying, vacating, or otherwise modifying this Final Order or any provision contained herein without the prior written consent of the ABL Agent and the Term Agent; (ix) the actual amount of (A) "Total Receipts"; (B) "Total Disbursements"; (C) "Total Inventory Ending Balance"; and (D) "Professional Fees/Escrow" in any Measurement Period deviates beyond the Permitted Variance as set forth in Paragraph 3(c) hereof from the amounts set forth in the Budget for such Measurement Period, without, in each instance, the prior written consent of the ABL Agent and the Term Agent; (x) any Debtor fails to pay in full the Secured Obligations on or before December 31, 2019 in accordance with the terms set forth in this Final Order, without the prior written consent of the ABL Agent or the Term Agent, as applicable; (xi) any material misrepresentation by any Debtor in the financial reporting or certifications to be provided by the Debtors to the ABL Agent or the Term Agent under the Loan Documents and/or this Final Order; (xii) any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of any Debtor's assets or entry of any order confirming any such confirmation plan or sale that is not conditioned on the payment in full in cash, on the effective date of such plan or sale, of all Secured Obligations); (xiii) the Debtors fail to provide any additional adequate protection ordered by the Court and such failure shall continue unremedied for more than three (3) business days after written notice thereof; (xiv) the Debtors fail to maintain "Net Availability After Covenant," as defined on line 26 of the Budget, in an amount of at least $4,000,000 at all times as reflected on the "Net Availability After Covenant" line item of each Borrowing Base Certificate delivered to ABL Agent and Term Agent in accordance with the terms of this Final Order; (xv) any Debtor files an plan of reorganization prior to Payment in Full of all Secured Obligations without the prior written consent of ABL Agent and the Term Agent;

21

(xvi) any Debtor's failure to perform, in any respect, any of its material obligations under this Final Order; (xvii) the termination or resignation of either the Store Closing Consultant or the CRO without the prior written consent of the ABL Agent and the Term Agent; or (xviii) any Debtor, including any subsidiary or affiliate thereof, promotes or otherwise markets discounting of ABL Priority Collateral offered for sale at any store location other than in the normal course of business without the ABL Agent's prior written consent (each of the forgoing, a "Termination Event").

      6.      Adequate Protection.

          (a)      Replacement Liens.

          (i)      *ABL Replacement Lien*.    Subject to the Carve Out and the Intercreditor Agreement, as adequate protection for and solely to the extent of the amount of diminution in value of its interests in the Collateral from and after the Petition Date, including, without limitation, the aggregate amount of Cash Collateral used by each Debtor on a dollar for dollar basis, the imposition of the automatic stay, the subordination of the ABL Agent's and ABL Lenders' Liens and Claims to the Carve Out and any other act or omission which causes diminution in the value of its interests in the Collateral (collectively, the "Diminution in Value"), the ABL Agent, for the benefit of itself and the ABL Lenders is hereby granted, pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests (the "ABL Replacement Lien") in and upon all of each Debtor's presently owned or hereafter acquired property and assets, whether such property and assets were acquired by such Debtor before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof, including, without limitation, (a) the proceeds from any disposition of any leasehold interests ("Lease Disposition Proceeds"), but not the leasehold interests themselves, and (b) property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code ("Avoidance Action Proceeds") (collectively, to the extent acquired after the

Petition Date, the "ABL Postpetition Collateral" and, together with the Prepetition Collateral including Cash Collateral, the "ABL Collateral"). The ABL Replacement Lien shall be junior and subordinate only to (A) liens of the Term Agent in the Term Priority Collateral, (B) the ABL Prepetition Liens on the Prepetition Collateral, and (C) the Carve Out, and shall otherwise be senior to all other security interests in, liens on, or claims against any asset of a Debtor and all rights of payment of all other parties. Other than as set forth herein, the ABL Replacement Lien shall not be made subject to or *pari passu* with any lien or with any lien or security interest previously or hereinafter granted in any of the Cases or any Successor Case. The ABL Replacement Lien shall be valid, binding, and enforceable against any trustee or other estate representative appointed in any Case, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (collectively, "Successor Cases") and/or upon the dismissal of any Case or Successor Case. For the avoidance of doubt, the ABL Agent and ABL Lenders cannot enter onto any leased premises of any Debtor to exercise the Debtors' rights and privileges as lessee under such lease in connection with a Termination Event unless they do so in accordance with (A) a separate written agreement between the ABL Agent and/or ABL Lenders, on one hand, and the applicable landlord, on the other, (B) pre-existing rights of the ABL Agent and ABL Lenders, or (C) entry of an order of this Court obtained by motion of the ABL Agent and ABL Lenders on such notice to the applicable landlord as shall be required by this Court.

(ii)     *Term Loan Replacement Lien*. Subject to the Carve Out and the Intercreditor Agreement, as adequate protection for and solely to the extent of the amount of diminution in value of its interests in the Collateral from and after the Petition Date, including, without limitation, the aggregate amount of Cash Collateral used by each Debtor on a dollar for dollar basis, the imposition of the automatic stay, the subordination of the Term Agent's and Term Lenders' Liens and Claims to the Carve Out and any other act or omission which causes diminution in the value of its interests in the Collateral (collectively, the "Term Diminution in Value"), the Term Agent, for the benefit of

itself and the Term Lenders is hereby granted, pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests (the "Term Loan Replacement Lien") in and upon all of the each Debtor's presently owned or hereafter acquired property and assets, whether such property and assets were acquired by such Debtor before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof, including, without limitation, (a) Lease Disposition Proceeds, but not the leasehold interests themselves, and (b) Avoidance Action Proceeds ((a) and (b) being collectively defined as "Conditional Term Loan Post-Petition Collateral"; and collectively, to the extent acquired after the Petition Date, the "Term Loan Postpetition Collateral" and, together with the Term Priority Collateral and the Cash Collateral, the "Term Loan Collateral"); provided, that Term Loan Replacement Lien in Conditional Term Loan Post-Petition Collateral shall extend to only that portion of such Conditional Term Loan Post-Petition Collateral necessary to reimburse Term Lenders on account of any Stub Rent Reserve (defined below) funding contribution made, if any, by Term Lenders under Paragraphs 21(b) and 34 hereof.  The Term Loan Replacement Lien shall be junior and subordinate only to (A) liens of the ABL Agent on the ABL Priority Collateral, (B) the Term Loan Prepetition Liens on the Term Loan Prepetition Collateral, and (C) the Carve Out, and shall otherwise be senior to all other security interests in, liens on, or claims against any asset of a Debtor and all rights of payment of all other parties.  Other than as set forth herein, the Term Loan Replacement Lien shall not be made subject to or *pari passu* with any lien or with any lien or security interest previously or hereinafter granted in any of the Cases or any Successor Case. The Term Loan Replacement Lien shall be valid, binding and enforceable against any trustee or other estate representative appointed in any Case or Successor Case and/or upon the dismissal of any Case or Successor Case.  For the avoidance of doubt, the Term Agent and Term Lenders cannot enter onto any leased premises of any Debtor to exercise the Debtors' rights and privileges as lessee under such lease in connection with a Termination Event unless they do so in accordance with (A) a separate

24

written agreement between the Term Agent and/or Term Lenders, on one hand, and the applicable

landlord, on the other, (B) pre-existing rights of the Term Agent and Term Lenders, or (C) entry of

an order of this Court obtained by motion of the Term Agent and Term Lenders on such notice to the

applicable landlord as shall be required by this Court.

      (b)    <u>Default Interest</u>.  At all times during the Cases, interest on all outstanding

Secured Obligations shall bear interest at the applicable Default Rate (as defined and set forth in the

ABL Credit Agreement and the Term Loan Credit Agreement, as applicable).

      (c)    <u>Section 507(b) Priority Claims</u>.

      (i)    *<u>ABL Adequate Protection Superpriority Claim</u>*.  Subject only to the

Carve Out and the Intercreditor Agreement, as adequate protection for the Diminution in Value of its

interest in the Collateral the ABL Agent, for the benefit of itself and the ABL Lenders, is hereby

granted as and to the extent provided by Sections 503 and 507(b) of the Bankruptcy Code, an

allowed superpriority administrative expense claim in the Cases and any successor bankruptcy case

(the "<u>ABL Adequate Protection Superpriority Claim</u>").  The ABL Adequate Protection Superpriority

Claim shall be subordinate to (A) the Carve Out solely to the extent set forth in this Final Order, and

(B) to the Term Loan Adequate Protection Superpriority Claim to the extent set forth in the

Intercreditor Agreement, but otherwise shall have priority over all administrative expense claims,

including administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b)

and 507(b) of the Bankruptcy Code, and unsecured claims against each Debtor and each Estate now

existing or hereafter arising, of any kind or nature whatsoever.

      (ii)    *<u>Term Loan Adequate Protection Superpriority Claim</u>*.  As adequate

protection for the Term Diminution in Value of its interest in the Collateral, the Term Agent, for the

benefit of itself and the Term Lenders, is hereby granted as and to the extent provided by Sections

503 and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the

Cases and any successor bankruptcy case (the "<u>Term Loan Adequate Protection Superpriority</u>

Claim"). The Term Loan Adequate Protection Superpriority Claim shall be subordinate to (A) the Carve Out solely to the extent set forth in this Final Order, and (B) the ABL Adequate Protection Superpriority Claim to the extent set forth in the Intercreditor Agreement, but otherwise shall have priority over all administrative expense claims, including administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, and unsecured claims against each Debtor and each Estate now existing or hereafter arising, of any kind or nature whatsoever; provided, that Term Loan Adequate Protection Superpriority Claim shall only be satisfied from the proceeds of Conditional Term Loan Post-Petition Collateral in an amount necessary to reimburse Term Lenders on account of any Stub Rent Reserve (defined below) ~~funding contribution made, if any, by Term Lenders under Paragraphs 21(b) and 34 hereo~~f.

(d)    _Mandatory Paydowns of ABL Obligations_.    For so long as any ABL Obligations remain outstanding and are not fully satisfied and paid in full on terms and conditions acceptable to ABL Agent, commencing on November 29, 2019, and on the Friday of each week thereafter, Debtors shall make mandatory payments to the ABL Agent (to effect such payments, the ABL Agent is authorized and shall apply Cash Collateral maintained in the Debtors' bank accounts) in the amount set forth in line 16 of the Budget for such week for permanent application against the ABL Obligations, for the benefit of the ABL Agent and the other ABL Lenders, in such order and manner as ABL Agent may determine in its discretion and in accordance with the terms of the ABL Loan Documents and subject to the Intercreditor Agreement; provided, that any such payments shall be made without prejudice to the rights of the Committee, to seek an appropriate remedy from the Court in accordance with and to the extent set forth in paragraph 18(b) of this Order.

(e)    _Additional Payments from Sale of Collateral_.    Notwithstanding anything to the contrary set forth herein, in the Budget, or in any other order entered in these Cases, if the ABL Agent and other ABL Lenders have not received the indefeasible payment in full of all ABL Obligations at the time of a Substantial Asset Disposition Transaction, then the Debtors shall pay to

the ABL Agent, for itself and the benefit of the other ABL Lenders, all unpaid ABL Obligations that are or which may become due and payable pursuant to the ABL Loan Documents from the net sale proceeds generated from any sales, dispositions, or proceeds of casualty insurance of all ABL Priority Collateral (as defined in the Intercreditor Agreement) outside the ordinary course of Debtors' businesses, including sales or dispositions of ABL Priority Collateral with respect to all "going out of business" sales and all other sales of ABL Priority Collateral pursuant to section 363 of the Bankruptcy Code until all ABL Obligations are paid in full in accordance with the ABL Loan Documents and Intercreditor Agreement. All of the ABL Agent's and ABL Lenders' Rights under the ABL Loan Documents and all of the Term Agent's and Term Lenders' Rights under the Term Loan Documents, with regard to the ABL Obligations and Term Loan Obligations, respectively, and otherwise are expressly reserved and, by the Final Order, preserved.

(f)    ABL Agent is hereby authorized to (i) maintain Cash Collateral in an amount equal to one hundred and five percent (105%) of all Letter of Credit Obligations (as defined in the ABL Credit Agreement); and (ii) apply such Cash Collateral, or any portion thereof, immediately upon any draw on any Letter of Credit (as defined in the ABL Credit Agreement).

(g)    Payment and Review of Lender Fees and Expenses. As further adequate protection, the Debtors shall pay all fees and expenses under the Loan Documents, including, without limitation, the non-refundable payment to the ABL Agent and the Term Agent of the reasonable and documented attorney fees and expenses and any other professional fees and expenses whether incurred before or after the Petition Date and whether incurred in connection with the Loan Documents, the Collateral, or the Cases; provided, that the Debtors shall pay all such reasonable fees and expenses within ten (10) business days of delivery of a summary statement or invoice for such fees and expenses (it being understood that such statements or invoices shall not be required to be maintained in any particular format, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any

27

such payments) to the Debtors' Restructuring Co-Counsel, the U.S. Trustee, and the Committee Counsel, unless, within such five (5) business day period, the Debtors, the U.S. Trustee or the Committee serve a written objection upon the requesting party, in which case, the Debtors shall pay only such amounts that are not the subject of any objection and the withheld amount subsequently agreed by the objecting parties or ordered by the Court to be paid. Any and all amounts paid by the Debtors pursuant to this paragraph 6(g) are deemed permitted uses of Cash Collateral and not subject to the Budget, the Budget Compliance Report, or Permitted Variance.

(h)    <u>Cash Management</u>.    Until ABL Agent receives Payment in Full (defined below) of the ABL Obligations, (i) ABL Agent shall have, and continue to have, exclusive dominion and control on all deposit accounts and other accounts of Debtors, and all banks, depository entities, securities intermediaries and commodities intermediaries that are parties to any Control Agreements (as defined in the ABL Credit Agreement) shall be authorized and directed to continue affording ABL Agent with exclusive dominion and control over such accounts in accordance with the terms and conditions of the applicable Control Agreements, all of which agreements are hereby ratified and authorized in accordance with their respective terms; and (ii) prior to the Termination Date, ABL Agent shall (A) hold, and not apply to repay the ABL Obligations except as otherwise set forth in the Final Order, all Cash Collateral actually received by ABL Agent, and (B) remit, upon a request from the Debtors and subject to the terms of this Final Order, such received Cash Collateral to the Debtors' operating account no less than once a week in an aggregate amount up to the amount set forth in line 14 of the Budget entitled "Total Disbursements" for the week in which such request(s) are made; <u>provided</u>, that on and after the Termination Date, and subject to the Intercreditor Agreement, ABL Agent shall be authorized to apply any and all Cash Collateral on hand or thereafter received by ABL Agent against the ABL Obligations for permanent application against the ABL Obligations without further notice to the Debtors or any other party. The term "<u>Payment in Full</u>" or "<u>Paid in Full</u>" means (i) all of the ABL Obligations have been paid in full in cash; (ii) in the case of

any contingent or unliquidated ABL Obligations, including, without limitation, any obligations that Debtors are required to furnish cash collateral to ABL Agent in accordance with the ABL Loan Documents, and any other liabilities arising from matters or circumstances known to ABL Agent at the time which are reasonably expected to result in any actual loss, cost, damage or expense (including attorneys' fees and legal expenses) to ABL Agent, the provision to ABL Agent of cash collateral in an amount determined by ABL Agent to fully secure and collateralize such contingent or unliquidated obligations and liabilities; and (iii) that ABL Agent and ABL Lenders shall receive a release from each Debtor and the Committee of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities in form and substance acceptable to ABL Agent.

(i) <u>Consent Fee</u>. In consideration for the Term Agent's and Term Lenders' consent to the use of Cash Collateral in accordance with the terms of this Final Order, the Term Agent shall be paid, in addition to all Term Loan Obligations owing by Debtors to the Term Agent and Term Lenders, (a) a consent fee in the amount of $500,000, which fee was fully earned on the entry of the Interim Order and payable only after satisfaction in full of all ABL Obligations and (b) a consent fee in the amount of $150,000, which fee was fully earned on the entry of the Final Order and payable only after satisfaction in full of all ABL Obligations, Term Loan Obligations, the consent fee set forth in clause (a) of this paragraph, allowed Stub Rent Claims, and allowed claims under section 503(b)(9) of the Bankruptcy Code.

(j) <u>Additional Adequate Protection</u>. Notwithstanding anything to the contrary set forth herein, the adequate protection granted by this Final Order is without prejudice to the ABL Agent's and the Term Agent's rights to seek additional adequate protections from this Court. The use of Cash Collateral pursuant to the terms and conditions of this Final Order and in accordance with the Budget shall not be deemed to be a consent by the ABL Agent or the Term Agent to any

other or further use of Cash Collateral or to the use of any Cash Collateral in any amount or for any purpose in excess of the amount set forth in the Budget for each such type of disbursement.

7.    Insurance.    At all times the Debtors shall maintain casualty and loss insurance coverage for the Collateral on substantially the same basis as maintained prior to the Petition Date. The Debtors shall provide the ABL Agent and the Term Agent with proof of the foregoing within five (5) days of written demand and give the ABL Agent and Term Agent reasonable access to Debtors' records in this regard.

8.    Proof of Claim.    The ABL Agent and Term Agent will not be required to file proofs of claim or requests for approval of administrative expenses in any Case or Successor Case. The acknowledgment by Debtors of the Secured Obligations and the liens, rights, priorities and protections granted to or in favor of the ABL Agent and the Term Agent in respect of the Prepetition Collateral as set forth herein and in the Loan Documents shall be deemed a timely filed proof of claim on behalf of the ABL Agent and the Term Loan, as applicable, in each of the Cases.

9.    Relief from the Automatic Stay.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit (i) the Debtors to implement and perform the terms of this Final Order, (ii) the Debtors to create, and the ABL Agent to perfect, the ABL Replacement Lien and other Liens granted hereunder, and (iii) the Debtors to create, and the Term Agent to perfect, the Term Loan Replacement Lien and other Liens granted hereunder.  The ABL Agent and the Term Agent shall not be required to file UCC financing statements or other instruments with any other filing authority to perfect the Liens, including the ABL Replacement Lien and the Term Loan Replacement Lien, granted by this Final Order or to take any other actions to perfect such Liens, which shall be deemed automatically perfected by the docketing of this Final Order by the Clerk of the Court, and deemed to be effective as of the Petition Date.  If, however, the ABL Agent or the Term Agent shall elect for any reason to file, record, or serve any such financing statements or other documents with respect to

30

such Liens, then the Debtors shall execute same upon request and the filing, recording, or service thereof (as the case may be) shall be deemed to have been made at the time of the commencement of this Case on the Petition Date.

(b)     In addition, and without limiting the foregoing, upon the occurrence of the Termination Date, and after the ABL Agent and the Term Agent providing five (5) business days (the "Stay Relief Notice Period") prior written notice (the "Enforcement Notice") to (i) the Court, (ii) co-counsel for the Debtors, (iii) lead counsel for the Committee, and (iv) the U.S. Trustee, and in accordance with the terms of this Final Order, the ABL Agent and the Term Agent shall be entitled to an expedited hearing before this Court to occur immediately following the expiration of the Stay Relief Notice Period in order to obtain relief from the automatic stay provisions of section 362 of the Bankruptcy Code to take any action and exercise all rights and remedies against the Collateral provided under this Final Order, the Loan Documents or applicable law that the each of the ABL Agent and the Term Agent may deem appropriate in their sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the ABL Agent or the Term Agent have been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all ABL Obligations and Term Loan Obligations.  For the avoidance of doubt, the Stay Relief Notice Period shall run simultaneously from the date that ABL Agent or Term Agent provides any notice to the Debtors, the U.S. Trustee, and the Committee that is required pursuant to paragraph 4 of this Final Order.

(c)     The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit the ABL Agent and the Term Agent to perform any act authorized or permitted under or by virtue of the Interim Order, this Final Order, the ABL Credit Agreement, the Term Loan Credit Agreement, the other Loan Documents, as applicable, including, without limitation, (i) to implement the post-petition financing

31

arrangements authorized by this Final Order, (ii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (iii) to assess, charge, collect, advance, deduct, and receive payments with respect to the Secured Obligations, including, without limitation, all interests, fees, costs and expenses permitted under the Loan Documents, and apply such payments to the Secured Obligations, and (iv) immediately following the expiration of the Stay Relief Notice Period, to take any action and exercise all rights and remedies provided to it by this Final Order, the ABL Credit Agreement, the Term Loan Credit Agreement, the other Loan Documents, or applicable law. In addition, and without limiting the foregoing, upon the expiration of the Stay Relief Notice Period, each of the ABL Agent and Term Agent shall be entitled to take any action and exercise all rights and remedies provided to it by this Final Order, the Loan Documents or applicable law that each of the ABL Agent or Term Agent may deem appropriate in its discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the ABL Agent and Term Agent, have been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Secured Obligations.

11.     _Reversal, Modification, Vacatur, or Stay_. Any reversal, modification, vacatur, or stay of any or all of the provisions of this Final Order (other than in accordance with the Final Order) shall not affect the validity or enforceability of any ABL Replacement Lien, the ABL Adequate Protection Superpriority Claim, any Term Loan Replacement Lien, the Term Loan Adequate Protection Superpriority Claim, or any claim, lien, security interest, or priority authorized or created hereby with respect to any ABL Replacement Lien, the ABL Adequate Protection Superpriority Claim, any Term Loan Replacement Lien or the Term Loan Adequate Protection Superpriority Claim, incurred prior to the effective date of such reversal, modification, vacatur, or stay. Notwithstanding any reversal, modification, vacatur, or stay (other than in accordance with the Final Order), (a) this Final Order shall govern, in all respects, any use of Cash Collateral or ABL Replacement Lien, ABL Adequate Protection Superpriority Claim, Term Loan Replacement Lien, or

Term Loan Adequate Protection Superpriority Claim incurred by the Debtors prior to the effective date of such reversal, modification, vacatur, or stay, and (b) the ABL Agent and the Term Agent, as applicable, shall be entitled to all the benefits and protections granted by this Final Order with respect to any such use of Cash Collateral or such ABL Replacement Lien, ABL Adequate Protection Superpriority Claim, Term Loan Replacement Lien or Term Loan Adequate Protection Superpriority Claim incurred by the Debtors.

12.     No Waiver for Failure to Seek Relief. The failure or delay of the ABL Agent or the Term Agent to seek relief or otherwise exercise any of its rights and remedies under this Final Order, the ABL Credit Agreement, the Term Loan Credit Agreement, the other Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise, by the ABL Agent or the Term Agent, as applicable.

13.     Section 507(b) Reservation. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder to the ABL Agent and the Term Agent, as applicable, is insufficient to compensate for any Diminution in Value during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the ABL Agent or the Term Agent, that the adequate protection granted herein does in fact adequately protect the ABL Agent and the Term Agent, as applicable, against any Diminution in Value or Term Diminution in Value, respectively of their respective interests in the Prepetition Collateral (including the Cash Collateral).

14.     Marshalling. In no event shall the ABL Agent or the Term Agent be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral; provided, that no proceeds of Conditional Term Loan Post-Petition Collateral shall be applied in satisfaction of the Term Loan Obligations until such time as the proceeds of all other available Collateral have been applied to the satisfaction of the Term Loan Obligations. The ABL Agent and the Term Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the

33

"equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the ABL Agent and Term Agent with respect to proceeds, products, offspring or profits of any of the Collateral, as applicable.

15.    <u>Agents' Inspection Rights</u>.  Without limiting the rights of the ABL Agent or the Term Agent contained in this Final Order, the ABL Agent and the Term Agent shall have the right, upon three (3) business days written notice to the Debtors, at any time during the Debtors' normal business hours, to inspect, audit, examine, check, make copies of or extract from the non-privileged books, accounts, checks, orders, correspondence and other records of the Debtors, and to inspect, audit and monitor all or any part of the Collateral, and the Debtors shall make all of same reasonably available to the ABL Agent and Term Agent, and each of their representatives, for such purposes.

16.    <u>Limitations on Cash Collateral Usage</u>.  The Cash Collateral shall not, directly or indirectly, be used to pay administrative expenses of the Debtors and or the Estates except for those operating expenses (including the statutorily required fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. §1930 and any interest due thereon) that are set forth in the Budget or with the prior written consent of the ABL Agent or, following Payment in Full of the Obligations (as defined in the ABL Credit Agreement), the Term Agent.  The Cash Collateral and the Carve Out may not be used in connection with or to finance in any way: (a) any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) for the payment of any services rendered by the professionals retained by any Debtor or the Committee, or other representative of any estate, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief invalidating, setting aside, avoiding or subordinating, in whole or in part, any Prepetition Liens or Secured Obligations, (ii) for monetary, injunctive or other affirmative relief against the ABL Agent, Term Agent, the Lenders, or any Prepetition Collateral, or (iii) preventing, hindering or

34

otherwise delaying the exercise by the ABL Agent, Term Agent or Lenders of any rights under this Final Order; (b) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the ABL Agent or Term Agent; (c) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the ABL Agent, the ABL Lenders, the ABL Prepetition Liens, the Term Agent, the Term Lenders, or the Term Loan Prepetition Liens; or (d) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, the Secured Obligations or any other rights or interest of the ABL Agent, Term Agent and/or Lenders; <u>provided</u>, that up to an aggregate amount of $25,000 of (x) the proceeds of the Prepetition Collateral (including Cash Collateral) or (y) the Carve Out may be used by the Committee during the Challenge Period to investigate the claims and liens of the ABL Agent and Term Agent (and other potential claims, counterclaims, causes of action or defenses against the ABL Agent, Term Agent and Lenders.

17.    <u>Binding Effect</u>. This Final Order shall be binding upon and inure to the benefit of the ABL Agent, the Term Agent, and the Debtors and their respective successors and assigns, including, without any limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code. No rights are entered under this Final Order for the benefit of any creditor of the Debtors, any other party in interest in the Cases, or any other person or entities, or any direct, indirect or incidental beneficiaries thereof.

18.    <u>Effect of Debtors' Stipulations on Third Parties</u>.

(a)    Subject to this Paragraph 18, each stipulation, admission, and agreement contained in this Final Order including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their Estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for

all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges as of the date of the Petition Date.

       (b)     Nothing in this Final Order shall prejudice the rights of the Committee or any other party in interest, if granted standing by the Court, to seek, solely in accordance with the provisions of this Paragraph 18, to assert claims against the ABL Agent, ABL Lenders, Term Agent, or Term Lenders, on behalf of the Debtors or the Debtors' creditors or to otherwise challenge the Debtors' Stipulations, including, but not limited to, those in relation to (i) the validity, extent, priority, or perfection of the security interests, and liens of the ABL Agent, ABL Lenders, Term Agent, and Term Lenders (ii) the validity, allowance, priority, or amount of the ABL Obligations or the Term Loan Obligations, or (iii) any liability of the ABL Agent or ABL Lenders with respect to anything arising from the ABL Loan Documents or any liability of the Term Agent or Term Lenders with respect to anything arising from the Term Loan Documents; provided that the $750,000 administration and consent fee paid by Debtors to the ABL Agent in accordance with the Administration & Consent Fee Letter, dated October 21, 2019 shall not be subject to a Challenge (as defined below). Notwithstanding forgoing, the Committee or any other party in interest must, after obtaining standing approved by the Court, commence a contested matter or adversary proceeding raising such claim, objection, or challenge, including, without limitation, any claim or cause of action against the ABL Agent, ABL Lenders, Term Agent or Term Lenders (each, a "Challenge") no later than (i) with respect to the Committee, the date that is sixty (60) days after the Committee's formation, (ii) with respect to other parties in interest, no later than the date that is seventy-five (75) days after the entry of the Interim Order, or (iii) with respect to any chapter 11 trustee appointed in the Cases, or any chapter 7 trustee appointed in any Successor Case, prior to the expiration of the periods set forth in subsections (i) and (ii) above, no later than the date that is the later of (A) fourteen (14) days after the appointment of such trustee or (B) the expiration of the time periods set forth in the foregoing subsections (i) and (ii) above (collectively, the "Challenge Period"). The

Challenge Period may only be extended with the written consent of the ABL Agent or the Term Agent, as applicable, prior to the expiration of the Challenge Period, and for the avoidance of doubt, any such extension shall only apply to the ABL Agent or the Term Agent, as applicable. Only those parties in interest who commence a Challenge within the Challenge Period may prosecute such Challenge. As to (x) any parties in interest, including the Committee, who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and overruled or otherwise finally resolved or adjudicated in favor of the ABL Agent or the Term Agent, as applicable, or (y) any and all matters that are not expressly the subject of a timely Challenge: (1) any and all such Challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Debtors' Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Case), shall be deemed to be forever waived and barred, (2) all of the findings, Debtors' Stipulations, waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the claims, liens, and interests of the ABL Agent, ABL Lenders, Term Agent and Term Lenders, as applicable, shall be of full force and effect and forever binding upon the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases, and (3) any and all claims or causes of action against the ABL Agent, ABL Lenders, Term Agent and Term Lenders, as applicable, relating in any way to the ABL Loan Documents, ABL Obligations, and ABL Prepetition Liens or the Term Loan Documents, Term Loan Obligations, or Term Loan Prepetition Liens, as applicable, shall be released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

(c)    Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their Estates, including, without limitation, any Challenge with respect to the Loan Documents or the Secured Obligations.

19.    Reporting.

(a)    Debtors shall provide the ABL Agent and the Term Agent with all financial and other information required under the ABL Loan Documents and the Term Loan Documents, as applicable, and this Final Order, and such other information as the ABL Agent and the Term Agent, as applicable, may from time to time reasonably request.

(b)    During the Cash Collateral Period, Debtors shall (i) authorize Agents to communicate directly with the Debtors' professionals, including, without limitation, each of Greenhill & Co., LLC and Hilco Streambank (collectively, the "I-Bankers"), regarding all matters relating to the services to be rendered by the I-Banker to the Borrowers in connection with the ongoing solicitation for a Substantial Asset Disposition Transaction, contacts made or to be made, terms and term sheets, and such other matters as Agents shall reasonably request from time-to-time; (ii) shall authorize and direct the I-Bankers to communicate directly with Agents regarding all matters relating to the services to be rendered by the I-Bankers to the Borrowers in connection with the ongoing solicitation for a Substantial Asset Disposition Transaction, and to provide Agents (with a copy to Debtors) with term sheets and other information prepared or reviewed by the I-Bankers with respect to a Substantial Asset Disposition Transaction; and (iii) agree, either independently or in combination with or through the I-Bankers, to provide Agents with periodic reports, which may be in the form of a verbal update at the Debtors' and/or at the I-Bankers' discretion, at such times as may be reasonably requested by Agents, but in no event less frequently than twice per week, unless otherwise agreed by the Agents, the Debtors and the I-Bankers, as applicable, in each case at times that may be reasonably agreed by the parties, concerning the status of the ongoing efforts to complete a Substantial Asset Disposition Transaction.  From and after the Petition Date, Debtors shall provide copies of all Substantial Asset Disposition Transaction-related term sheets and/or letters of intent (whether preliminary, interim or final in form and content) to Agents not later than one (1) calendar day following Debtors' and/or I-Bankers' receipt of same. For purposes of hereof, the following

38

terms shall have the following meanings: (A) "Substantial Asset Disposition Transaction" shall mean a transaction providing for the merger, sale, transfer, assignment, conveyance or other disposition by Debtors (including a transaction(s) pursuant to Section 363 of title 11 of the United States Code), involving all or substantially all of the Debtors' assets or equity interests, which may be accomplished by one or more individual sales or dispositions by Debtors of the assets or equity interests of Debtors (other than sales or other dispositions of Inventory in the ordinary course of Debtors' business), which transaction provides for the payment at closing of cash consideration sufficient to pay in full all of the ABL Obligations and Term Loan Obligations, respectively, due to the Agents and Lenders at the time of closing thereof, the terms and conditions of which transaction shall be set forth in a Substantial Asset Disposition Agreement and otherwise be satisfactory to Agents and Lenders in their discretion; and (B) "Substantial Asset Disposition Agreement" shall mean an agreement that provides for the merger, sale or disposition (including a transaction(s) pursuant to Section 363 of title 11 of the United States Code), which may be accomplished by one or more individual sales or dispositions by Debtors of all  or substantially all of the assets or equity interests of Debtors (other than sales or other dispositions of Inventory in the ordinary course of Debtors' business) that provides or collectively provide for the payment at closing of cash consideration sufficient to pay in full all of the ABL Obligations and Term Loan Obligations, respectively, due to the Agents and Lenders at the time of closing thereof.

20.    <u>Effectiveness</u>.  The terms and conditions of this Final Order shall be (a) effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Fed. R. Bankr. P. 6004(g), 7062, 9014 or otherwise; and (b) not be stayed absent (a) an application by a party in interest for such stay in conformance with such Fed. R. Bankr. P. 8005, and (b) a hearing upon notice to the Notice Parties.

21.    Section 506(c) Claims.

(a)    No costs or expenses of administration which have or may be incurred in the Cases shall be charged against the ABL Agent or the Term Agent, their claims or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the ABL Agent or the Term Agent, and no such consent shall be implied from any other action, inaction or acquiescence by the ABL Agent or the Term Agent, as applicable.

22.    Releases. Upon the earlier of (a) the entry of the Final Order, or (b) the entry of an order extending the Cash Collateral Period, and in each instance, subject to paragraph 18 above, in consideration of the ABL Agent and the Term Agent permitting the Debtors to use the Pre-Petition Collateral (including Cash Collateral) pursuant to the provisions of this Final Order, each Debtor, on behalf of itself and its successors and assigns (collectively, the "Releasors"), shall forever release, discharge and acquit the ABL Agent, the ABL Lenders, the Term Agent, the Term Lenders, and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such (collectively, the "Pre-Petition Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof in connection with the Debtors, the Loan Documents, or the Obligations (as defined in the ABL Credit Agreement or the Term Loan Credit Agreement, as applicable).

23.    Survival. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in any of the Cases, (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any of the Cases or Successor Cases, or (d) pursuant to which this Court abstains from

40

hearing any of the Cases or Successor Cases. The terms and provisions of this Final Order as well as the ABL Adequate Protection Superpriority Claim the ABL Replacement Lien, the Term Loan Adequate Protection Superpriority Claim, the Term Loan Replacement Lien and all other claims and Liens granted by this Final Order, shall (a) continue in this or any other superseding case under the Bankruptcy Code, (b) be valid and binding on all parties in interest, including, without limitation, any Committee, chapter 11 trustee, examiner or chapter 7 trustee, and (c) continue, notwithstanding any dismissal of any Case or Successor Case (and any such order of dismissal shall so provide), and such claims and Liens shall maintain their priority as provided by this Final Order until the Obligations (as defined in the ABL Credit Agreement or the Term Loan Credit Agreement, as applicable) are satisfied in full.

24.    <u>Discharge Waiver</u>.    The Debtors expressly stipulate, and the Court finds and adjudicates that, neither the ABL Adequate Protection Superpriority Claim, the ABL Replacement Lien, the Term Loan Replacement Lien, or the Term Loan Adequate Protection Superpriority Claim shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding section 1142(d) of the Bankruptcy Code, unless (i) the order is entered with the prior written consent of the ABL Agent or the Term Agent, as applicable, or (ii) the ABL Adequate Protection Superpriority Claim or the Term Loan Adequate Protection Superpriority Claim, as applicable, has been paid in full in cash on or before the effective date of such plan.

25.    <u>Rights Preserved</u>.    Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the ABL Agent's and the Term Agent's right to seek any other relief in respect of the Debtors (including the right to seek additional adequate protection); (b) the ABL Agent's and the Term Agent's right to seek the payment by the Debtors of post-petition interest pursuant to section 506(b) of the Bankruptcy Code; or (c) any rights of the ABL Agent and the Term Agent under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the

41

automatic stay pursuant to section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or an examiner (with or without expanded powers), (iii) propose a chapter 11 plan or plans of reorganization, subject to section 1121 of the Bankruptcy Code, or (iv) consent in writing prior to the sale of all or any portion of the Collateral outside the ordinary course of the Debtors' business (and no such consent shall be implied or construed by any action or inaction by the either the ABL Agent or the Term Agent).  Other than as expressly set forth in this Final Order, any other rights claims or privileges (whether legal, equitable or otherwise) of the ABL Agent and the Term Agent are preserved.

26.    <u>Payment of Compensation</u>.  Nothing herein or in the Budget shall be construed as consent to the allowance of any professional fees or expenses of any Professionals or shall affect the right of any party to object to the allowance or payment of such fees and expenses.  Neither the ABL Agent nor the Term Agent shall be responsible for the funding, direct payment or reimbursement of any fees or expenses of any Professionals incurred in connection with the Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be construed to obligate the ABL Agent or the Term Agent in any way to pay compensation to or reimburse expenses of any Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

27.    <u>Milestones</u>. Each Debtor shall satisfy or cause to be satisfied, as applicable, each of the following conditions:

(a)    **On or prior Friday, November 22, 2019**, the Court shall have entered the Final Order, in form and substance acceptable to ABL Agent and Term Agent, among other things, approving the Debtors' use of Cash Collateral.

(b)    **On or prior to Wednesday, December 4, 2019**, the Debtors shall have delivered a proposed amended Budget in form and substance acceptable to ABL Agent and Term Agent (the "<u>Amended Budget</u>").

(c)    **On or prior to Thursday, December 5, 2019**, the Debtors shall have received one or more binding bids, in form and substance satisfactory to ABL Agent and Term Agent, in an amount not less that the aggregate amount of all outstanding ABL Obligations and Term Loan Obligations.

(d)    **On or prior to Monday, December 9, 2019**, the Debtors shall have conducted an auction, if any (*i.e.*, if there is more than one bid), for a Substantial Asset Disposition Transaction(s) and, in accordance with the order approving bidding procedures, selected the winning bid(s) for such Substantial Asset Disposition Transaction(s) at the conclusion of such auction.

(e)    If the Debtors have not received one or more binding bids at the auction on December 9, 2019 in form and substance satisfactory to ABL Agent and Term Agent, in an amount not less that the aggregate amount of all outstanding ABL Obligations and Term Loan Obligations, then the Amended Budget shall become the Budget effective as of the start of the week ending December 14, 2019.

(f)    **On or prior to Thursday, December 12, 2019**, the Court shall have entered an Order, in form and substance acceptable to ABL Agent and Term Agent, among other things, approving a Substantial Asset Disposition Transaction(s); and

(g)    **On or prior to Tuesday, December 31, 2019**, the Debtors shall have made Payment in Full of all outstanding ABL Obligations and all Term Loan Obligations.

28.    Application of Proceeds. All proceeds of the Collateral received by the ABL Agent and the Term Agent, and any other amounts or payments received by the ABL Agent and Term Agent in respect of the Obligations (as defined in the ABL Credit Agreement or the Term Loan Credit Agreement, as applicable), may be applied or deemed to be applied by the ABL Agent and the Term Agent in such manner and priority as the ABL Agent and the Term Agent may determine in their discretion, all in accordance with the Intercreditor Agreement and this Final Order. Without

43

limiting the generality of the foregoing, the Debtor is authorized without further order of this Court to pay or reimburse the ABL Agent and the Term Agent for future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by the ABL Agent and the Term Agent as provided in this Final Order and the Loan Documents, all of which shall be and are included as part of the principal amount of the Obligations (as defined in the ABL Credit Agreement or the Term Loan Credit Agreement, as applicable) and secured by the Collateral.

29.    Disposition of Collateral.  Notwithstanding anything to the contrary set forth herein or otherwise, Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral outside the ordinary course of business, other than pursuant to the terms of the ABL Credit Agreement and Term Loan Credit Agreement, without the prior written consent of the ABL Agent and Term Agent, respectively (and no such consent shall be implied, from any other action, inaction or acquiescence by the ABL Agent, Term Agent or any Lenders), or as otherwise ordered by the Court. All cash proceeds generated from the sale of Collateral shall be paid to the ABL Agent or Term Agent, as applicable, in accordance with the terms of the Intercreditor Agreement upon the closing of such sale for permanent application against the Secured Obligations owing by the Debtors to ABL Agent or Term Agent, as applicable in accordance with the terms and conditions of (a) this Final Order, (b) the Intercreditor Agreement, and (c) the other Loan Documents, until such time as all such Secured Obligations have been Paid in Full.

30.    Inventory.  Debtors shall not, without the consent of the ABL Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5906122.5

31.    <u>Texas Taxing Authorities</u>.  Notwithstanding any other provisions included in the Interim Order or this Final Order, or any other order regarding the disposition of the Debtors' assets, any statutory liens (the "<u>Texas Tax Liens</u>") of the Texas taxing authorities identified in Docket Nos. 130, 142, and 181 (the "<u>Texas Taxing Authorities</u>") shall not be primed by nor made subordinate to any liens granted to any party to the extent such Texas Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount and extent of the claims and liens asserted by the Texas Taxing Authorities all fully preserved.  From the proceeds of the sale of any of the Debtors' assets located in Texas, the Debtors shall set aside in a segregated account the total amount asserted by the Texas Taxing Authorities to be due and owing in the aggregate amount of $88,369.31 (the "<u>Texas Adequate Protection Amount</u>") as adequate protection for the asserted claims of the Texas Taxing Authorities prior to the distribution of any such Texas proceeds to any other creditor.  The liens of the Texas Taxing Authorities, if any, shall attach to these proceeds to the same extent and with the same priority as the liens, if any, the Texas Taxing Authorities now hold against the Debtors' property.  The Texas Adequate Protection Amount shall not be deemed an allowance of any claim of the Texas Taxing Authorities, or a cap on any such claim, and all parties' rights to object to such amounts are hereby preserved.  Following the funding of the Texas Adequate Protection Amount, the Texas Taxing Authorities shall cooperate in good faith the Debtors to reconcile all amounts alleged to be due and owing, including, but not limited to, providing the necessary invoices evidencing the same.

32.    <u>Westchester Fire.</u>  Nothing in this Final Order or any prior financing or cash collateral order approved by this Court (collectively, the "<u>Cash Collateral Orders</u>") shall in any way subordinate or affect any valid, enforceable, perfected, and non-avoidable liens of Westchester Fire Insurance Company ("<u>Westchester</u>"), its past, present or future parents, subsidiaries or affiliates (with Westchester, the "<u>Surety</u>") as to: (a) any funds that the Surety or the principal on any bond issued or executed by the Surety (collectively, "<u>Principal</u>") is holding and/or are being held ~~surety~~ for the

45

*Setoff and recoupment rights of the surety and/or its obligee on any bond issued by the Surety, by subrogation or otherwise, as well as subrogation rights of the Surety, if any, are fully preserved.*

Surety or the Principal, whether in trust, as security, or otherwise, ~~and that are segregated from all other assets of the Debtors,~~ (b) any substitutions or replacements of said funds including accretions to and interest earned on said funds, and (c) any letter of credit related to any indemnity and/or the proceeds thereof, collateral trust, bond or agreements between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates, including the Letter of Credit bearing number IS000018284U (collectively (a) to (c), the "Surety Assets"). Nothing in the Cash Collateral Orders shall affect the rights of the Surety under any indemnity, collateral trust, or related agreements between or involving the Surety and any of the Debtors ~~solely as to the Surety Assets~~. In addition, nothing in the Cash Collateral Orders shall subordinate or affect any valid, enforceable, perfected, and non-avoidable lien rights of the Surety, the Principal, or any party to whose rights the Surety, has or may become subrogated thereto ~~solely as to the Surety Assets~~. If any Surety Assets are being held by the Debtors and are used by them as cash collateral, then the Surety may seek adequate protection of its interest in those Surety Assets, and nothing in the Cash Collateral Orders shall bar the Surety from seeking, or the Court from granting, such adequate protection. In addition, notwithstanding anything in the Cash Collateral Orders to the contrary, the rights, claims, and defenses of the Debtors and of the Surety, including, but not limited to, the Surety's rights under any properly perfected liens and claims and/or claim for equitable rights of subrogation, and rights of the Debtors and of any successors in interest to any of the Debtors, and any creditors, to object to any such liens, claims, and/or equitable subordination and other rights, are fully preserved. Nothing herein is an admission by the Surety, the Lenders, or the Debtors, or a determination by the Bankruptcy Court, regarding any claims under any bonds or indemnity agreements, and all parties reserve any and all rights and defenses in connection therewith.

33.     <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Final Order in accordance with its terms and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Final Order.

5906122.5

34.    Stub Rent Reserve. Following funding of the Carve Out, the Debtors shall establish a funded reserve (the "Stub Rent Reserve") from the proceeds of any Substantial Asset Disposition Transaction to satisfy the obligations arising under the Debtors' non-residential real property leases for the period October 21, 2019 through October 31, 2019 ("Stub Rent Claims"). The Debtors shall be authorized and directed to pay undisputed Stub Rent Claims from the Stub Rent Reserve without further order of the Court, and shall work diligently to reconcile and pay any disputed Stub Rent Claims from the Stub Rent Reserve when agreed to by the Debtors or as determined by final order of the Court. Upon the final reconciliation and payment of allowed Stub Rent Claims from the Stub Rent Reserve, the Stub Rent Reserve shall terminate and any remaining funds shall be returned (i) if the ABL Obligations or Term Loan Obligations have not been paid in full, first to the ABL Agent for the benefit of the ABL Lenders and/or the to the Term Agent for the benefit of the Term Lenders to the extent necessary to satisfy the ABL Obligations and/or Term Loan Obligations in accordance with the Loan Documents and Intercreditor Agreement, and (ii) once the ABL Obligations and Term Loan Obligations have been paid in full, then to the Debtors. For the avoidance of doubt, except as otherwise provided in this Final Order, none of the ABL Agent, ABL Lenders, the Term Agent or the Term Lenders shall be responsible for funding any reserve, including, without limitation, the Stub Rent Reserve.

35.    Chief Restructuring Officer. Unless otherwise agreed by the ABL Agent and Term Agent, the Debtors shall maintain and continue their retention of the CRO (as defined in the Interim Order) until such time as the Debtors make Payment in Full of all ABL Obligations and all Term Loan Obligations.

36.    <u>Priority of Terms</u>. To the extent of any conflict between or among (a) the Motion, any other order of this Court, or any other agreements, on the one hand; (b) the terms and provisions of the Interim Order, and (c) the terms and provisions of this Final Order, the terms and provisions of this Final Order shall govern.

Dated: November 22, 2019
Wilmington, Delaware

THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

5906122.5